**Patrick Logan MONTGOMERY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 05–87–00677, 05–87–00678–CR.**

Court of Appeals of Texas, Dallas.

Nov. 26, 1991.

Discretionary Review Refused March 18, 1992.

R.K. Weaver, Dallas, for appellant.

Patricia Poppoff Noble, for appellee.

Before LAGARDE, KINKEADE and MALONEY, JJ.

OPINION ON REMAND

LAGARDE, Justice.

These cases come to us on remand from the Court of Criminal Appeals. Patrick Logan Montgomery was convicted by a jury in two cases of indecency with a child and sentenced to ten years' imprisonment in each case. This Court originally affirmed the trial court's judgments. *Montgomery v. State*, 760 S.W.2d 323 (Tex.

App.—Dallas 1988) (*Montgomery I*), rev'd, 810 S.W.2d 372 (Tex.Crim.App.1991) (op. on reh'g). The Court of Criminal Appeals granted Montgomery's petition for discretionary review and held that this Court erred in determining that the trial court did not abuse its discretion in admitting evidence that Montgomery had appeared naked and with an erection in his daughters'[1] presence, an extraneous offense.[2] *Montgomery v. State*, 810 S.W.2d 372, 397 (Tex.Crim.App.1991) (op. on reh'g) (*Montgomery II*). The Court of Criminal Appeals remanded the causes to us to conduct a harm analysis on this issue. *Id.* On remand, Montgomery brings three points of error contending that the extraneous offense was harmful, that the trial court erred in submitting a parole instruction in the jury charge, and that the trial court erred in overruling his objections to certain questions asked him by the State during the punishment phase of trial. We hold that the evidence of the extraneous offense was harmless, overrule Montgomery's other points, and affirm the trial court's judgments.

### HARMLESS ERROR ANALYSIS

In the first point, Montgomery contends that the improperly admitted evidence of his appearing nude with an erection in front of his daughters was harmful. Montgomery argues that this Court's determination of this issue is controlled by the doctrine of the law of the case, while the State maintains that Montgomery waived any error by failing to make the correct objection at trial. We reject both arguments and proceed to a harm analysis as ordered by the Court of Criminal Appeals.

#### Law of the Case

■ In his brief, Montgomery argues that, because the Court of Criminal Appeals found that the potential prejudice of the extraneous offense greatly outweighed

its probative value, the doctrine of the law of the case requires that we find the evidence harmful. That doctrine "provides that an appellate court's resolution of a question of law in a previous appeal of the same case will govern the disposition of the same issue should there be another appeal." *Ware v. State*, 736 S.W.2d 700, 701 (Tex.Crim.App.1987). If the Court of Criminal Appeals had, in fact, addressed the issue of the harmfulness of the evidence, then this Court would be bound to follow the higher court's determination. The Court of Criminal Appeals, however, did *not* address that issue but determined only that the "probativeness was minimal while the *potential* for prejudice was great." *Montgomery II*, 810 S.W.2d at 397 (emphasis added). That court never reached the issue of whether that potential prejudice became actual harm. If it had reached that issue, it would not have remanded the causes to this Court "for a determination of whether the error in admitting the evidence was harmless under Rule 81(b)(2)...." *Id.* Thus, notwithstanding Montgomery's assertions to the contrary, the doctrine of the law of the case does not require that we hold the evidence to be harmful.

■ In its first counterpoint, the State contends that Montgomery waived the issue of whether the probative value of the evidence was greatly outweighed by its prejudicial effect. As the State notes in its brief, the Court of Criminal Appeals stated, "At no point in the appellate process, including in response to appellant's original petition and on rehearing, has the State complained that appellant failed to preserve error. That question is therefore not before us." *Montgomery II*, 810 S.W.2d at 395. The State asserts to this Court that the Court of Criminal Appeals ignored the "waiver argument" that the State made in its brief on rehearing before that court. The issue of preservation of error, like

---

1. Montgomery had three daughters at the time of the offenses, A___, Al___, and An___. Montgomery was convicted of touching Al___ and An___, but was not tried for touching his youngest daughter, A___. At the time of trial, A___ was five years old, Al___ was seven years old, and An___ was ten years old.

2. Montgomery maintains that this evidence constitutes the offense of indecent exposure. *See* Tex.Penal Code Ann. § 21.08 (Vernon 1989).

other arguments for or against a court's ruling, may be waived if not presented at the proper time. *Tallant v. State,* 742 S.W.2d 292, 294 (Tex.Crim.App.1987). We interpret the Court of Criminal Appeals' language as implicitly holding that the State waived the issue of preservation of error.

Although this Court may consider on remand new contentions not raised either on original submission or before the Court of Criminal Appeals, *McClain v. State,* 730 S.W.2d 739, 741 (Tex.Crim.App.1987), we cannot consider new arguments that would circumvent the determinations of a higher court. A holding by this Court that Montgomery did not preserve error on the issue of the prejudicial effect of the extraneous offense would have the effect of circumventing the Court of Criminal Appeals' determination that this Court erred in holding that the trial court did not abuse its discretion by admitting evidence of the extraneous offense. Because the Court of Criminal Appeals implicitly held that the State did not timely raise the issue of preservation of error, this Court is bound by that determination. We, therefore, do not reach the State's waiver argument.

### Standard of Review

Under the harmless error analysis, this Court must reverse these convictions unless we find that, beyond a reasonable doubt, the extraneous offense made no contribution to the convictions or to the punishment assessed. *Harris v. State,* 790 S.W.2d 568, 584 (Tex.Crim.App.1989); TEX.

R.App.P. 81(b)(2). In making a harmless error determination, we do not focus on the weight of other evidence of guilt but instead determine whether the error might have prejudiced a juror's decision-making process. *Harris,* 790 S.W.2d at 587. To make this determination, we must isolate the effect of the error and determine how much weight a juror would probably place upon the error. *Id.* If the error was of such a magnitude that it disrupted the juror's orderly evaluation of the evidence, no matter how overwhelming the evidence might have been, then the conviction must be reversed. *Id.* at 588. Unless overwhelming evidence dissipates the error's effect upon the jury's function in determining the facts so that it did not contribute to the verdict, then the error is harmful. *Id.* at 587.

### The Extraneous Offense

The only extraneous offense at issue is the evidence that Montgomery would walk around naked with an erection in front of his children.[3] The only witness to testify to this offense was Linda Rockwell, one of Montgomery's ex-wives, who testified in response to questions by the State as follows: [4]

> Q. At about—you met him in June or July and you began baby-sitting for him. Was there a time after that that you began living with him?
>
> A. Yes, ma'am.
>
> Q. And when would that be?
>
> A. In October.

3. When the State first presented evidence on this issue, the defense was granted a running objection to any evidence of Montgomery appearing nude before the children. On appeal, however, Montgomery only challenged the evidence of Montgomery's appearing nude with an erection before his children as an extraneous offense. It was this specific instance of nudity that the Court of Criminal Appeals held inadmissible. Therefore, in conducting the harm analysis, we will address only the harm caused by the evidence of Montgomery being nude with an erection. We consider Montgomery to have waived on appeal any error in the admission of other instances of nudity before the children (showering with them, urinating in front of them, etc.), and we will use those other instanc-

es of nudity to explain the harmlessness of the evidence deemed inadmissible by the Court of Criminal Appeals.

4. In light of the rhetoric used both in this Court and the Court of Criminal Appeals to describe the evidence in these cases, *see Montgomery II,* 810 S.W.2d at 396–97; *Montgomery I,* 773 S.W.2d 569, 569–72 (Howell, J., dissenting), we will depart from our usual practice of paraphrasing testimony and instead will quote at length from the record in order to avoid any possibility of misstating the substance and effect of the testimony. While this will have the unfortunate effect of greatly lengthening this opinion, we have no doubt that brevity should be sacrificed when necessary to achieve justice.

Q. During those times did you spend a fair amount of time with the defendant and his children?

A. Yes, ma'am, I did.

Q. Did you have an opportunity to watch him around the children?

A. Yes, ma'am, I did.

Q. Did you ever see the defendant walking around the children in any inappropriate dress?

A. Yes, ma'am, I did.

Q. And could you tell the jury how that was?

A. He would walk around in front of the children with no clothes on, he would—

[Relevancy and "getting into extraneous offenses" objections overruled.]

Q. Ma'am, when you say the defendant walked around in front of his children without any clothes on, do you mean he was totally nude?

A. Yes, ma'am.

Q. Was there any visible sign—when he walked around in the nude in front of his children were there any visible signs of sexual arousal?

A. Yes, ma'am.

[State-of-mind objection overruled.]

Q. What visual signs, what did you see?

A. I saw him with an erection in front of the children.

Q. And that was when he would walk around in the nude?

A. Yes, ma'am.

Q. Did this happen just once or numerous times?

A. He would be in front of the children quite frequently when I first met him.

Q. In the nude?

A. In the nude.

Q. With erection?

A. With erections.

Q. And when he would do this did you say anything to him?

A. Yes, ma'am, I did.

Q. And what did you say to him?

A. I told him to put on clothes. He had robes, he had clothes, it was inde-cent, it was not nice, it was inappropriate.

Q. What did he say in response to that?

A. He didn't want the children to be afraid.

Q. He didn't want the children to be afraid?

A. Of the male body.

After the defense cross-examined Rockwell, the prosecutor asked her why she suspected that Montgomery was sexually abusing his children.

Q. Okay. In retrospect, looking back on it, was there anything else that led you to believe [that Montgomery was sexually abusing his children]?

A. There was [sic] several.

Q. Well, did you feel it was normal for him to walk around nude in front of the girls with an erection?

A. No, ma'am.

Q. Was that one of the things you might have considered?

A. Yes, ma'am.

These two exchanges constitute the only testimony concerning the extraneous offense at issue presented by the State in its case-in-chief in over one hundred fifty pages of testimony. The defense asked only two questions concerning the extraneous offense, both of which were directed to Montgomery, who testified in his own behalf. The first of these exchanges went as follows:

Q. Did—to your recollection, to your knowledge were you ever present with the children when you had an erection?

A. No. I had my robe that I would wear as well, but I would never walk around.

Twenty-three pages later, Montgomery was again asked about the extraneous offense by his counsel:

Q. During this period of time from October of '82 through the time you were at the Peachtree Apartments, did you— were you ever in the presence of your children when you had an erection?

A. No.

These two questions constitute the only mention of the extraneous offense during Montgomery's testimony, which consists of approximately seven hundred questions and more than one hundred ten pages in the statement of facts and constitutes the bulk of the defense's case-in-chief, which exceeds one hundred forty pages. No other testimony concerning Montgomery being naked with an erection in front of his children was presented to the jury by either the State or the defense.

The only other time the extraneous offense was mentioned was during the jury arguments at the guilt-innocence phase of the trial. Montgomery's counsel told the jury:

I—It's just that I can't impress upon you the gravity of this situation. He said he never had an erection in front of the girls, he did not parade around in the nude, he did not give French kisses to them, he did not talk to them in the manner he was accused of talking to them. What else can you do? What else can you do?

In response, the prosecutor told the jury:

He could have brought you who? One of his wives. He couldn't bring you them because we brought them to you, because the people who knew him, the people who lived with him, the people who saw him with his children on a daily, hourly basis testified against him. They testified about how he exposed himself. He's not on trial for that. He's not on trial for walking around his two little girls or three little girls with an erection, but it certainly shows a motive, doesn't it? It shows a sexual arousal around little tiny girls. Well, the Defense attorney is right. He's not on trial for being aroused around children, but it goes to his intent.

The quotes from the record set out above constitute the only argument, questions, testimony, or comments of any form before the jury concerning the extraneous offense that the Court of Criminal Appeals held to be inadmissible. No comments, questions, testimony, or argument concerning the offense were made before the jury during the punishment phase of the trial.

### Other Evidence

In order to determine the effect, if any, that the extraneous offense had upon the jury, we must examine the other evidence presented to the jury relevant to the same issue as the extraneous offense—Montgomery's specific intent in touching his children. That other evidence consists of testimony that Montgomery would: (a) discuss with his second wife differences between the girls' genitals; (b) ask the girls whether they had "washed their slits," that is, their genitals; (c) use other inappropriate language toward the girls; (d) French kiss his youngest daughter; (e) urinate in front of the girls; and (f) join them in the shower while they bathed. Additionally, one of Montgomery's daughters testified that he removed his underpants before committing one of the charged offenses. Finally, both girls testified that, after Montgomery had touched them, he told them not to tell anyone.

The State's first witness, Esther Crumpler, who was the girls' mother and Montgomery's first wife, testified that Montgomery ran away with the children and that it took her nearly two years to find them. When she did regain custody of her children, they needed psychological therapy and "[did not] want to talk about the time that they were with their father." She was also the first witness to testify to Montgomery's use of inappropriate language to the girls. On direct examination by the State, she testified as follows:

Q. During the time you and your husband lived together prior to October 16th, 1982 [the date he disappeared with the children] with your children, had you ever heard him talk to the children in any inappropriate manner?

A. Yes, ma'am.

Q. And what would he say to them? [Relevancy objection overruled.]

A. "Give me some of your hot kisses."

Q. Did he ever say anything else?

A. "We were made for each other."

Montgomery's counsel inquired briefly about these comments on cross-examination:

Q. The statement you said your husband made, when did you hear him make these statements?

A. What statements are you referring to?

Q. About "give me some of your hot kisses" and "we were made for each other." When did you hear that?

A. During our marriage.

Q. Could you be a little more specific as to what year?

A. Between 1976 and 1982.

Q. You can't be any more specific than that? You don't recall?

A. It was very often.

Q. Those were the two phrases he always used?

A. Yes, sir.

Linda Rockwell, Montgomery's second wife and the only witness to testify to the extraneous offense, testified next for the State. She met Montgomery in June 1983 at the apartment complex where they both resided and would frequently baby-sit for him. She later married and eventually divorced Montgomery. Besides the extraneous offense, Rockwell also testified to the following questionable conduct of Montgomery:

Q. Ma'am, did you under any other circumstances ever see the defendant using or displaying his genitals in front of the children other than walking around in the nude?

[Relevancy and "brings in extraneous offenses" objections overruled.]

A. Yes, ma'am, he would go to the rest room in front of the children; they would walk in while he was taking a shower; I on one occasion found one of the children in the shower with him.

Q. When you say that he—did you say he would urinate with the children in there with him?

A. Yes, ma'am.

Q. Was that a common occurrence?

A. Yes, ma'am.

Q. Did you ever see the defendant kissing his youngest child, that would be A____, in any inappropriate manner?

A. Yes, ma'am.

[Relevancy and "extraneous offense" objections overruled.]

\* \* \* \* \* \*

Q. How did you see A____, that would be the youngest girl, kissing the defendant?

A. Open mouth with the tongue.

Q. Is that what's commonly known as French kissing?

A. I believe so, yes, ma'am.

Q. Did you ever kiss A____?

A. Yes, ma'am.

\* \* \* \* \* \*

Q. Did you see A____ and the defendant French kissing on just one occasion or numerous occasions?

A. Numerous occasions.

[Relevancy and "extraneous offenses" objections overruled.]

A. On numerous occasions.

Q. So this wasn't just something that happened once?

A. No, ma'am.

Q. Would you typify it on [sic] few or many?

A. Many.

After testimony concerning the date of her divorce from Montgomery and the issue of whether the children were under the age of seventeen or married to Montgomery at the time of the offense, Rockwell testified that Montgomery would comment to her about the differences in the girls' genitals:

Q. Do you recall having a conversation with the defendant regarding the differences between the girls?

A. Yes, ma'am.

Q. And was that conversation initiated by the defendant?

A. Yes, ma'am.

Q. What did he say to you?

[Objection based on confidentiality of husband-wife communication overruled.]

A. He was talking about the differences in the girls' genital areas and how

they were built differently, one being larger or smaller than the other.

Q. And what were the words he used in regard, I believe, to Al___?

A. That Al___ had a fat pussy.

Q. And that—those were his words?

A. Yes, ma'am.

Q. Did he compare that to the other girls' genitals?

A. Yes, ma'am.

Q. What did he say about the other girls?

A. That An___ was smaller, K___ [5] was smaller.

The State then questioned Rockwell about the language Montgomery would use towards his children when they were bathing:

Q. During the time that you knew him did you ever hear him ask the girls about washing?

A. Yes, ma'am.

Q. How did he typically talk to his little girls about washing their genital areas?

A. He—

[Relevancy and "husband/wife communication privilege" objections overruled.]

A. He would ask the girls had they washed their slits.

Q. Was that typical that he generally asked them about that sort of thing?

A. Yes, ma'am.

Q. And those were his words?

A. Yes, ma'am.

On redirect examination, Rockwell testified to Montgomery's use of the same inappropriate language as Crumpler testified to:

Q. ... Did the defendant ever say anything to his daughters that you felt was inappropriate?

A. Yes, ma'am.

Q. And what sort of things did he say?

A. "You and I were made for each other." "Give me your hot love." "My lips were made for kissing."

Q. Did he ever say "Press my hot lips"?

A. "Press your hot lips to mine."

Q. And is this the normal sort of way he talked to his children?

A. Yes, ma'am.

Q. Was that one instance that, when thinking later, after having talked to your child, was that one of the many things that led you to believe there might possibly have been some sexual abuse?

A. Yes, ma'am.

Rockwell then testified that one of the other indications that led her to believe that Montgomery was sexually abusing his children was his asking the children whether they had "washed their slits." On recross-examination, the defense counsel inquired as to Montgomery's reasons for using the language, "You and I were made for each other," "Press your hot lips to mine," and "Did you wash your slits?" When Rockwell could not remember the exact words Montgomery used when she asked him why he used such language towards the girls, the defense counsel ceased questioning her on the issue. On redirect examination, however, the State took up the issue:

Q. Even though you don't recall word for word what he said, do you recall the gist of what he said?

[Speculation objection overruled.]

A. They were terms of endearment for him towards his children.

The last witness to discuss Montgomery's behavior around his daughters was Patricia Newbold, Linda Rockwell's sister. She also testified to Montgomery's inappropriate language around his children:

Q. Were you ever able to hear the defendant talking with his girls?

A. Yes.

Q. Did you ever hear him say anything that was inappropriate to them?

A. Yes.

Q. And what would that be?

A. Usually when he'd come in from work the girls would come to greet him and he would grab up the littlest one, A___, and kiss her and say, "Press your lips against—Press your hot lips to mine." "My lips need pressing." "Give me some of your hot love."

---

**5.** K___ is Rockwell's daughter, not Montgom- ery's, and is about A___'s age.

Q. Did you ever hear him talk to the girls about their washing habits?

A. Yes. Usually when I was there I would bathe the girls. Sometimes he would open the door and stick his head in, or from the outside just go by and say, "Don't forget to wash your slit."

Q. That was the way he typically talked to them?

A. Yes.

The defense, on cross-examination, also inquired into Montgomery's language:

Q. When you say you heard defendant make statements such as, "Press your hot lips to mine;" "Your lips need pressing;" "Give me some of your hot love;" did you ever ask the defendant about those statements?

A. No, I just told him I didn't think that was appropriate to say to a young child.

Q. How many times did you tell him that?

A. Several.

Q. Did you ever discuss with him the statement you say he made about "Don't forget to wash your slit"?

A. I just told him he shouldn't talk to his children that way.

Q. What was his response?

A. He just looked at me and just went on. He never responded.

Newbold was later called as a witness by the defense during the defense's case-in-chief. When questioned by the prosecutor, she gave the following testimony:

Q. Ma'am, did you ever have an occasion to see the defendant kissing his youngest daughter A____?

A. Yes, I have. He used to French kiss A____.

Q. By that do you mean?

A. He used—he used to stick his tongue in her mouth.

Q. You saw that?

A. Yes, I did.

Q. Did you see that one time or numerous times?

A. Numerous times.

After the case worker for the Department of Human Services testified as to the circumstances surrounding the Department's taking custody of the girls and the interviews with the girls,[6] the two daughters whom Montgomery allegedly touched took the stand. Both of the daughters testified that, after Montgomery told them to remove their panties and then touched them, he told them not to tell anyone. Al___ testified that Montgomery removed his underpants immediately before touching her. Neither side questioned the daughters about the extraneous offense or about the inappropriate language and conduct testified to by Crumpler, Rockwell, and Newbold. Al___, the younger of the two girls, testified first:

Q. All right. Now will you tell them about the secret you and your daddy had?

A. Yes.

Q. What happened? Look over here, [Al___]. Tell me what happened.

A. My dad told me not to tell nobody.

Q. Well, it's okay to tell now, so will you tell us now?

A. Yes.

Q. Okay. Tell me what happened. Did your daddy come in a room?

[Leading objection overruled.]

A. Yes.

Q. What did he say when he came in the room?

A. Not to tell nobody.

\* \* \* \* \* \*

Q. ... What happened when your daddy walked in to the room?

A. He told me to pull down my panties.

Q. Okay. And did you do that?

A. Yes.

Q. Because he's your daddy, right, and you mind him?

A. Yes.

Q. Okay. Then what did you do.

A. I did what he told me to do.

Q. And what was that?

A. To pull down my panties.

---

**6.** The relevant portions of her testimony are set out in *Montgomery II,* 810 S.W.2d at 395–96.

Q. And then what?

A. Then he pulled down his panties.

Q. And then what did he do?

A. He molested me.

Q. Did you stand up or what?

A. I laid down.

Q. Where did you lay down?

A. In my room.

Q. Okay. Did you lay down in a chair or where?

A. On the floor.

Q. Okay. When you laid down on the floor were your panties down?

A. Yes.

Q. Okay. What happened after you laid down on the floor?

A. I pulled my panties back up.

Q. What happened when you—what did your daddy do when you laid down on the floor?

A. He molested me.

Q. How did he do that?

A. By touching me.

Q. What did he touch you with?

A. His hands.

Q. He put his hands where?

A. On my private.

        *    *    *    *    *    *

Q. ... Where did he put his hand?

A. In my private.

Q. In your private? And you mean that part between your legs, right?

A. Yes.

Q. And did he touch your bare skin?

A. Yes.

Q. Did any other part of him touch you when you were laying down on the floor?

A. No.

Q. Did he put anything else between your legs beside his hand?

A. No.

Q. Just his hand?

A. Yes.

Q. And you said your daddy told you not to tell anybody?

A. Yes.

        *    *    *    *    *    *

Q. Al___, you said that your daddy pulled his panties down too?

A. Yes.

Q. What did he do after he pulled his panties down?

A. He touched me.

Q. He touched you with what?

A. With his hand.

Q. Did he leave his panties down while he was doing that?

A. Yes.

Q. Where was your daddy when he touched you with his hand?

A. In my room.

Q. Was he standing up or laying down or sitting or what was your daddy doing?

A. Sitting.

Q. He was sitting. Was he sitting near you?

A. Yes.

Q. Was he sitting in a chair or was he sitting on the floor near you?

A. On the floor.

An___, Montgomery's eldest child, testified next:

Q. Do you remember a time when you and your daddy and your two sisters were living at Peachtree Apartments and you and your daddy had a secret?

A. Yes.

Q. Can you tell me what happened then?

A. Like what?

Q. Well, where were you when you and your daddy had the secret?

A. We were in his room.

Q. Okay. And what did he do?

A. He touched me.

Q. What did he touch you with?

A. His hand.

        *    *    *    *    *    *

Q. Okay. And what's this part right here between the legs?

A. It's pee.

Q. That's what you call it, the pee place?

A. Yes.

        *    *    *    *    *    *

Q. An___, where did your daddy put his hand?

["Assuming facts not in evidence" objection overruled.]

A. In the pee.

Q. In the pee place?

A. Yes.

Q. And did you have your panties on then?

A. No.

Q. Did he touch your bare skin?

[Leading objection overruled.]

A. Yes.

* * * * * *

Q. Did your daddy say anything to you about telling anyone about this?

A. Yes.

Q. What did he tell you?

A. He said not to tell anybody.

After the defense rested, the State and the defense presented rebuttal testimony. The defense called An___ to the stand. During questioning by the prosecutor, she testified as follows:

Q. An___, do you remember who Peggy Nichols [the case worker for the Department of Human Services] is?

A. Yes.

Q. Do you remember the secret you told us you and your daddy had?

A. Yes.

Q. You told us about that yesterday?

A. Yes.

Q. Did Peggy Nichols tell you to say that story?

A. No.

Q. Did she make that story up for you?

A. No.

Q. Did that really happen?

A. Yes.

During the jury arguments, the defense mentioned these other incidents only briefly and in conjunction with the extraneous offense:

He said he never had an erection in front of the girls, he did not parade around in the nude, he did not give French kisses to them, he did not talk to them in the manner he was accused of talking to them.

The State, however, argued these other incidents at length:

All the people who testified that knew him well who lived with him talked about how he talked around these children. "Press your hot lips against mine." "Give me your hot love." All of them testified to that inappropriate language. He's not on trial for saying disgusting things to his children, but it shows his intent. It shows the way he viewed those children, not like children, but like in a sexual manner, like a lover.

The people that lived with him, the people who knew him, the people who could testify regarding what a sterling, wonderful person he was around his children testified to such things as him saying to his children: "Have you washed your slits?" I'm embarrassed to have to repeat that in front of you, and he's not on trial for saying that sort of thing, but it shows the way he thought of these children, discussing the difference between the genital areas of four little girls all under the age of seven. He's not on trial for that, but it shows where his mind was, it shows what he thought of when giving little baby girls a bath.

### Harmlessness of the Extraneous Offense Testimony Under *Harris*

a. Guilt–Innocence

■ Following the dictates of *Harris*, we must now "calculate as much as possible the probable impact of the [erroneously admitted evidence] on the jury in light of the existence of the other evidence." *Harris*, 790 S.W.2d at 587. In making this determination, the *Harris* opinion directs us to examine six factors: (1) the source of the error; (2) the nature of the error; (3) whether and to what extent the State emphasized the error; (4) any collateral implications of the error; (5) the weight a juror would probably place upon the error; and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.* "If overwhelming evidence dissipates the error's effect upon the jury's

function in determining the facts so that it did not contribute to the verdict then the error is harmless." *Id.*

The source and nature of the error are clear: the trial court erred in admitting testimony the probative value of which was greatly outweighed by its prejudicial effect. *Montgomery II,* 810 S.W.2d at 397. The emphasis placed on the erroneously admitted evidence is likewise obvious: the State placed almost no emphasis on the testimony.[7] Once the prosecutor elicited Rockwell's testimony to the extraneous offense, the State never mentioned it again until jury argument. The prosecutors never questioned any other witness about the extraneous offense. During the jury argument, the State merely responded to the argument of defense counsel and reminded the jury that Montgomery was not on trial for exposing himself with an erection to his daughters. The only emphasis in the record placed on the evidence by the State occurred when the State told the jury that it could consider the erroneously admitted testimony in determining Montgomery's intent. Considering the nature of the extraneous offense and the charged offenses, if the jury considered the evidence at all, then it considered it only for the purpose of determining the specific intent with which Montgomery touched his daughters. The testimony could not have had any implications collateral to this issue.

Next, we "consider how much weight a juror would probably place upon the error." *Harris,* 790 S.W.2d at 587. This inquiry is the heart of the harmless error analysis. To make this determination, we must consider the dissipating effect of other evidence on the issue for which the jury would have considered the erroneously admitted testimony. In this case, that other evidence is so overwhelming that we have no hesitation in concluding beyond a reasonable doubt that the error did not contribute to the convictions.[8]

Against the evidence of Montgomery's appearing nude with an erection before his children, we balance the following other evidence relevant to the same issue as the extraneous offense:

1. Montgomery would urinate in front of his daughters;

2. Montgomery would shower with his daughters;

3. Montgomery would tell his daughters, "Press your hot lips to mine," "My lips were made for kissing," and "Give me your hot love";

4. Montgomery would discuss the differences in the girls' genital areas and say that one of the girls "had a fat pussy," "[t]hat An___ was smaller, K___ was smaller";

5. Montgomery would tell the girls to "wash your slit";

6. Montgomery would French kiss his youngest daughter;

7. We recognize that the Court of Criminal Appeals appears to have characterized the evidence somewhat differently in *Montgomery II:* "A substantial portion of the State's case was devoted to showing such extraneous misconduct, and most of appellant's evidence was responsive to it." *Montgomery II,* 810 S.W.2d at 397. Because only one of the State's six witnesses testified to the extraneous offense (and that evidence was only a small portion of her testimony) and only two questions concerning the extraneous offense were asked during the defense's entire case-in-chief, we can only assume that the Court of Criminal Appeals was referring to all of the testimony relevant to the issue of Montgomery's specific intent and not just the extraneous offense at issue on appeal. Even that evidence, however, falls short of the Court of Criminal Appeals' characterization.

8. This other evidence took up more than 80% of the questions relating to Montgomery's specific

intent. Less than 1% of the questions asked during the entire guilt-innocence phase of the trial concerned the extraneous offense. The evidence of Montgomery's intent took up less than 5% of the total questions. Most of the questions, beyond the preliminary questions concerning the educational and employment background of the witnesses, concerned the care or lack thereof that Montgomery and Crumpler provided the children; the reasons Crumpler, Rockwell, Newbold, and Nichols might have had for lying on the witness stand; whether the children had been forced or "coached" by the State's adult witnesses into testifying against their father; and whether Montgomery had stolen the children from Crumpler. During the jury argument, the attorneys accurately characterized the bulk of the testimony as "mud slinging."

7. Montgomery removed his underpants immediately before committing the charged offense against Al⎯; and

8. When Montgomery committed the charged offenses, he told his daughters not to tell anyone.

The various possible effects of the extraneous offense upon the jury was summarized thus by the Court of Criminal Appeals: "[I]t showed sexual arousal directed at his children, an undifferentiated sexual arousal imprudently displayed, or simply an incidental erection coupled with a damnable nonchalance." *Montgomery II*, 810 S.W.2d at 397. The offense may have left the jury with "a revulsion against [Montgomery's] parental demeanor." *Id.* However great the jury's "revulsion against his parental demeanor" may have been because of the extraneous offense, most of the other eight listed acts would leave the jury equally revolted against Montgomery's "parental demeanor" and "damnable nonchalance." Although the image of Montgomery walking around in the nude with an erection in front of his daughters is a graphic and disgusting one, the image of Montgomery kissing his youngest daughter by sticking his tongue in her mouth is far more shocking and disgusting. Unlike the act of walking around naked with an erection before his children, his French kissing A⎯ involved overtly sexual conduct inflicted on his youngest daughter. As for An⎯'s and Al⎯'s testimony that Montgomery told them not to tell anyone about the touchings, the Court of Criminal Appeals summarized its effect thus:

That appellant instructed both children not to reveal the event to anyone shows a consciousness of wrongdoing which in turn leads to an inference that when he touched the children as he did, appellant harbored a specific intent to arouse and gratify his own sexual desire. The children themselves may not have fully appreciated the significance of appellant's

conduct, but this would not diminish the impact of their testimony. Appellant's lascivious intent would be readily apparent to a jury of adults.

*Montgomery II*, 810 S.W.2d at 396. When Al⎯'s testimony that Montgomery had removed his own underpants before touching her is added, the shock value of the extraneous offense is reduced to nearly nothing.[9] As the Court of Criminal Appeals commented, "the events themselves, as related by the daughters and by a Department of Human Services caseworker, served unequivocally to establish appellant's intent to arouse and gratify his own sexual desire." *Id.* at 395. After considering all of the other evidence relating to Montgomery's intent, we have no hesitation in concluding that, qualitatively as well as quantitatively, the evidence is so overwhelming that a juror would probably place no weight upon the extraneous offense.

Finally, we must determine whether declaring the error harmless would encourage the State to repeat it with impunity. *Harris*, 790 S.W.2d at 587. Considering the tortured history and unusual facts of this case, we conclude that our holding it harmless will not encourage the State to present inadmissible extraneous offenses.

In examining the record as a whole, we conclude that Montgomery received a fair trial. The integrity of the process leading to his convictions was in no way affected by the admission of the extraneous offense. Indeed, as the State points out, Montgomery may not have properly preserved the complaint about the extraneous offense being substantially more prejudicial than probative.[10] We hold that the other evidence relevant to the same issue as the extraneous offense was so overwhelming that it dissipated the effect of the extraneous offense upon the jury's function in determining the facts. We conclude that, beyond a reasonable doubt, the extraneous offense

**9.** The State elicited Rockwell's testimony about the extraneous offense before eliciting any evidence about any of the other eight listed acts relating to his intent except for his saying "Press my hot lips," etc. to the children. Rockwell was the State's second witness, and Al⎯ and An⎯

were the last witnesses during the State's case-in-chief.

**10.** We have held, however, that the State has waived this point by not timely asserting it.

did not contribute to the jury's verdict of guilt. We therefore hold that the error is harmless as to the jury's determination of Montgomery's guilt.

b. Punishment

▇ Montgomery maintains that the trial court's erroneous admission of the extraneous offense harmed him at the punishment hearing because he was eligible for probation but was sentenced by the jury to ten years' confinement in each case. At the punishment phase, the jury could consider the evidence admitted at the guilt-innocence phase as well as the evidence admitted during the punishment phase. *Wright v. State,* 468 S.W.2d 422, 424 (Tex. Crim.App.1971); *Yohey v. State,* 801 S.W.2d 232, 242 (Tex.App.—San Antonio 1990, pet. ref'd). Neither the State nor Montgomery mentioned the extraneous offense during the punishment hearing. The only witnesses testifying in the punishment hearing were Montgomery and his wife. Both testified that, should he be given probation, he would continue to be able to support his family. Montgomery promised that he would stay away from A___, Al___, and An___ if given probation and that he would undergo any psychological counseling that might be ordered under the terms of probation. On cross-examination by the State, however, Montgomery gave the following testimony that cast doubt on the effectiveness of any therapy he might be asked to undergo on probation:

Q. Sir, do you agree with the jury's verdict here today?

A. I didn't do it. I don't agree.

Q. So you think they are—all these people are wrong?

A. I think they are wrong because they didn't get all the evidence, but yes.

Q. You think they are wrong?

A. It's not their fault. They weren't given the opportunity to receive all the evidence and I'm not blaming them. I would have probably done the same.

Q. ... You don't feel like you have done anything wrong; is that correct?

A. I didn't do what I have been charged, no.

Q. So all of this therapy that you are saying that you would go and get, you are aware that therapy will not help you in any way unless you open yourself up to it; is that correct?

["Counsel is testifying and [is] not qualified to ask questions such as that" objections overruled.]

A. I have gone through three state psychologists and I passed the bar.

Q. Excuse me, sir. Are you aware that therapy for regardless of the length of time, will not help a person who does not or is not willing to admit they have a problem?

[Objections overruled.]

A. I will do therapy.

Q. Excuse me, sir. Let me repeat my question to you. If you don't understand it, just let me know. Are you aware that therapy, regardless of the length of time, will not help a person who is not willing to admit they have a problem?

A. I will admit that therapy will work in a situation like that and I will cooperate to the best of my ability because that's what I want to do, but I'm saying everything I have been through has shown that I haven't and my—

Q. Excuse me, sir.

A. My ex-wife—

THE COURT: Just a moment.

A. —has a problem, not me.

On further cross-examination, Montgomery stated that he did not believe that incest was necessarily wrong in all circumstances:

Q. Would you agree that an incestuous relationship between a child and her father is not normal?

[Speculation, lack of witness' qualifications to answer the question, and relevancy objections overruled.]

A. I don't know.

Q. You don't know if incest between a child and her father is normal?

[Argumentative and question answered objections overruled.]

A. I don't know the circumstances. It would depend on those circumstances very much so.

Q. So you can think of a circumstance in which incest between a child and her father would be okay?

[Speculation and impropriety objections overruled.]

A. I wouldn't know how old the child would have to be, how long it had happened, how many times it had happened, all these things would bear, plus the character and background of the individual. If this person was a [hardened] criminal and had been down this road before I'm sure that this is something that might affect that child.

Q. So you think that a child who has been victimized sexually by his [sic] father might be okay if it was a white collar worker father as opposed to a blue collar worker?

[Speculation, relevancy, and impropriety objections overruled.]

A. I really don't know. There are really too many factors to consider. As you are telling me, the child under those charges could be as old as 17 and it could have happened one time and the person could have been a very sterling father and the charges in this case could be true or they could be false. I don't know. It's a hard position. It's a hard job to be a juror and I'm telling you, I don't know. You are asking me to evaluate something. I honestly can't. I'm not a psychologist.

Q. Is it fair to say that you can think of a situation in which incest is all right?

[Speculation and relevancy objections overruled.]

A. I don't know. I really don't.

During jury argument, the State argued that Montgomery should be sent to prison instead of given probation because of his lack of contrition on the witness stand, his stating that he does not have a problem and that his ex-wife does, and his testimony that incest is not necessarily wrong:

He'd rather have probation, of course he would. What's that going to do for him? How is that going to rehabilitate him? Has he come to terms with his problems? He doesn't have a problem. It's y'all's problem, it's not his. It was his wife's problem, she was lying, she was wrong. Linda's problem, Patricia's problem, Peggy Nichols' problem, his children's problem, and now all of [y'all's] problems, when all through this trial he hasn't had a problem. And how is psychological help going to help him? It's not going to help him.

\* \* \* \* \* \*

This man deserves the maximum. He doesn't think incest is all that bad. Come on, there are cases when incest is okay. And I'm sure all of you can think of two or three good reasons for incest, according to this defendant. Incest is all right? How is this man going to continue to function in society as a law-abiding man, as a father to a whole new group of children if incest can be okay?

[Arguing-outside-the-record objection overruled.]

Is this a man that needs to be out in the world? Is this a man who needs to be out around children? Incest can be okay? This man needs to be put away. He needs to be put away for as long as possible, he needs to pay for his crimes, and those children need to be kept safe from someone like him.

I'm going to ask you to give him the maximum you can, to send him to prison for as long as you can and to assess him a fine to let him know that what he has done is wrong and that you as representatives of this community are not going to put up with it, are not going to stand it and are not going to condone that behavior.

I appreciate your time.

We conclude that Montgomery's testimony and the State's argument dissipated any lingering effect the extraneous offense might have had on the decision-making process of the jury during the punishment phase. We hold that, beyond a reasonable doubt, the trial court's erroneous admission of the extraneous offense was harmless both at the guilt-innocence and the punishment phases of trial. The first point is overruled.

*McCLAIN*

In the second point, Montgomery contends that the submission of a parole charge was not harmless beyond a reasonable doubt, and, in the third point, he contends that "the trial court erred in permitting the State to interject irrelevant material concerning the long-term effects of this offense on the victim into the punishment phase of the trial." Both of these points were ruled on by this Court when this case was before us on the original appeal, and the Court of Criminal Appeals refused to consider these points on discretionary review. *See Montgomery I,* 760 S.W.2d at 326–329 (this Court's disposition of these points); *see also Montgomery II,* 810 S.W.2d at 375 & n. 1 (Court of Criminal Appeals' granting review on the extraneous offense and determining that its granting review on the issue of preservation of error on the victim-impact questions was improvident because "the error was [not?] properly preserved"). On remand, Montgomery asks us to reconsider our holdings on these points. We decline his invitation to do so.

Montgomery maintains that, when the Court of Criminal Appeals remands a case to a court of appeals, the court of appeals has the authority to consider any contentions that an appellant might then present, whether presented for the first time or previously decided when the case was first submitted to the court of appeals.[11] For this argument, Montgomery relies on the following language from *McClain v. State,* 730 S.W.2d 739 (Tex.Crim.App.1987):

> [W]here this Court [the Court of Criminal Appeals] has remanded a cause to a court of appeals, notwithstanding the terms and conditions of the remand order, the court of appeals is free to entertain any *new* contentions that a defendant might then present....

*Id.* at 741 (citing *Garrett v. State,* 749 S.W.2d 784, 786 (Tex.Crim.App.1986)) (emphasis added). Unlike the cases before us, however, *McClain* and *Garrett* involved

the raising on remand of *new* contentions, that is, contentions not previously argued to the court of appeals. *See id.* (issue raised for first time on remand); *Garrett,* 749 S.W.2d at 786 (issue raised for first time on motion for rehearing to Court of Criminal Appeals and that court denied the motion; issue then raised before the court of appeals for the first time on remand). Here, however, Montgomery is rearguing the same contentions that he argued when the case was originally before us and the same contentions that he asked the Court of Criminal Appeals to consider. We know of no reason to extend *McClain* to require the reconsideration on remand of contentions ruled on in the court of appeals in the original appeal and which the Court of Criminal Appeals has refused to review. Because we already have ruled once on these contentions and the Court of Criminal Appeals has refused to review our rulings, we will not address them again. Therefore, we overrule the second and third points.

We overrule all of Montgomery's points of error on remand and affirm the trial court's judgments.

---

11. The State makes the same argument in its first counterpoint. Because its argument would contravene the Court of Criminal Appeals' implicit finding that the State failed to timely pre-

serve its waiver argument, we need not address the issue of whether the State can rely on *McClain.*