# NO. 12-18-00274-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *LEONARD INTELISANO,*<br>*APPELLANT* | § | *APPEAL FROM THE 349TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *HOUSTON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Leonard Intelisano appeals his conviction for murder. In two issues, Appellant argues his sentence is grossly disproportionate and the trial court erred in admitting hearsay. We affirm.

### BACKGROUND

On January 13, 2016, officers with the Houston County Sheriff's Department responded to a call of a possible shooting. When officers arrived on the scene, they found Frank Thomas covered in blood and lying on the pavement next to his truck. Thomas had wounds to his left torso and arm that appeared to be caused by buckshot, and he was bleeding profusely. While speaking with the responding officers, Thomas identified Appellant as his assailant. It was later learned that Thomas had been shot in his orbital socket and a bullet had lodged in the back of his skull. Thomas also had a bullet in his back. The next day, Thomas was interviewed by a Texas Ranger in the hospital. During that discussion, Thomas again identified Appellant as the man who shot him. Thomas died four days later from his injuries.

Appellant was charged by indictment with murder. Appellant pleaded "not guilty" and the matter proceeded to a jury trial. Following evidence and argument, the jury found Appellant "guilty" as charged and assessed punishment at sixty-one years imprisonment and a $10,000 fine. The trial court sentenced Appellant accordingly, and this appeal followed.

## CRUEL AND UNUSUAL PUNISHMENT

In his first issue, Appellant argues that the sixty-one-year sentence imposed by the trial court is grossly disproportionate to the crime committed and amounts to cruel and unusual punishment. "To preserve for appellate review a complaint that a sentence is grossly disproportionate, constituting cruel and unusual punishment, a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired." *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd); *see also Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (waiver of complaint of cruel and unusual punishment under the Texas Constitution because defendant presented his argument for first time on appeal); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (defendant waived complaint that statute violated his rights under the United States Constitution when raised for first time on appeal); *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009) ("Preservation of error is a systemic requirement that a first-level appellate court should ordinarily review on its own motion[;] ... it [is] incumbent upon the [c]ourt itself to take up error preservation as a threshold issue."); TEX. R. APP. P. 33.1. A review of the record shows that Appellant lodged no objection to the constitutionality of his sentence at the trial court level, and has, therefore, failed to preserve error for appellate review. *See Kim*, 283 S.W.3d at 475; *see also Rhoades*, 934 S.W.2d at 120; *Curry*, 910 S.W.2d at 497; *Mays*, 285 S.W.3d at 889; TEX. R. APP. P. 33.1.

However, despite Appellant's failure to preserve error, we conclude his sentence does not constitute cruel and unusual punishment. The Eighth Amendment to the Constitution of the United States provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. This provision was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Meadoux v. State*, 325 S.W.3d 189, 193 (Tex. Crim. App. 2010) (citing *Robinson v. California*, 370 U.S. 660, 666–67, 82 S. Ct. 1417, 1420–21, 8 L. Ed. 2d 758 (1962)). The legislature is vested with the power to define crimes and prescribe penalties. *See Davis v. State*, 905 S.W.2d 655, 664 (Tex. App.—Texarkana 1995, pet. ref'd); *see also Simmons v. State*, 944 S.W.2d 11, 15 (Tex. App.—Tyler 1996, pet. ref'd). Courts have repeatedly held that punishment which falls within the limits prescribed by a valid statute is not excessive, cruel, or unusual. *See Harris v. State*, 656 S.W.2d 481, 486 (Tex. Crim. App. 1983); *Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973); *Davis*, 905 S.W.2d at 664.

In this case, Appellant was convicted of murder, a first-degree felony, the punishment range for which is between five and ninety-nine years, or life, imprisonment. *See* TEX. PENAL CODE ANN. §§ 12.32 (West 2019), 19.02(c) (West 2019). Thus, the sentence imposed by the trial court falls within the range set forth by the legislature. Therefore, the punishment is not prohibited as cruel, unusual, or excessive per se. *See Harris*, 656 S.W.2d at 486; *Jordan*, 495 S.W.2d at 952; *Davis*, 905 S.W.2d at 664.

Nevertheless, Appellant urges the court to perform the three-part test originally set forth in *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). Under this test, the proportionality of a sentence is evaluated by considering (1) the gravity of the offense and the harshness of the penalty, (2) the sentences imposed on other criminals in the same jurisdiction, and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Id.*, 463 U.S. at 292, 103 S. Ct. at 3011. The application of the *Solem* test has been modified by Texas courts and the Fifth Circuit Court of Appeals in light of the Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) to require a threshold determination that the sentence is grossly disproportionate to the crime before addressing the remaining elements. *See, e.g.*, *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992), *cert. denied*, 506 U.S. 849, 113 S. Ct. 146, 121 L. Ed. 2d 98 (1992); *see also Jackson v. State*, 989 S.W.2d 842, 845–46 (Tex. App.—Texarkana 1999, no pet.).

We are guided by the holding in *Rummel v. Estelle* in making the threshold determination of whether Appellant's sentence is grossly disproportionate to his crime. 445 U.S. 263, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980). In *Rummel*, the Supreme Court considered the proportionality claim of an appellant who received a mandatory life sentence under a prior version of the Texas habitual offender statute for a conviction of obtaining $120.75 by false pretenses. *See id.*, 445 U.S. at 266, 100 S. Ct. at 1135. In that case, the appellant received a life sentence because he had two prior felony convictions—one for fraudulent use of a credit card to obtain $80 worth of goods or services and the other for passing a forged check in the amount of $28.36. *Id.*, 445 U.S. at 265–66, 100 S. Ct. at 1134–35. After recognizing the legislative prerogative to classify offenses as felonies and, further, considering the purpose of the habitual offender statute, the court determined that the appellant's mandatory life sentence did not constitute cruel and unusual punishment. *Id.*, 445 U.S. at 284–85, 100 S. Ct. at 1144–45.

3

In this case, the offense committed by Appellant—murder—is considerably more serious than the combination of offenses committed by the appellant in **Rummel**, while Appellant's sixty-one-year sentence is less severe than the life sentence upheld by the Supreme Court in **Rummell**. Thus, it is reasonable to conclude that if the sentence in **Rummell** is not constitutionally disproportionate, neither is the sentence assessed against Appellant in this case. In his brief, Appellant makes a conclusory statement that his sixty-one-year sentence is grossly disproportionate, stating that "other much more serious crimes the defendant was convicted of resulted in significantly less harsh sentences than Appellant received." However, he cites to no authority to support this contention. *See* TEX. R. APP. P. 38.1(i) ("[t]he brief must contain a clear and concise argument for the contentions made, with appropriate citations to the authorities..."). Because we do not conclude that Appellant's sentence is disproportionate to his crime, we need not apply the remaining elements of the **Solem** test. Appellant's first issue is overruled.

## HEARSAY AND THE DYING DECLARATION EXCEPTION

In his second issue, Appellant argues that the trial court abused its discretion in permitting the officers to testify about Thomas's statements regarding the identity of his assailant because his statements constitute inadmissible hearsay.

### Standard of Review and Governing Law

We review a trial court's decision to admit evidence under an abuse of discretion standard. *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). A trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Id*.

Hearsay statements generally are not admissible unless the statement falls within a recognized exception to the hearsay rule. *Mick v. State*, 256 S.W.3d 828, 831 (Tex. App.–Texarkana 2008, no pet.). If the declarant is unavailable as a witness, his hearsay statement is admissible if it constitutes a dying declaration. *See* TEX. R. EVID. 804(b)(2). Before a statement is admissible as a dying declaration, it must meet the following three requirements: (1) the declarant must be unavailable; (2) the declarant, at the time he makes the statement, must believe his death is imminent; and (3) the statement must concern the cause or circumstances of the potential impending death. *Scott v. State*, 894 S.W.2d 810, 811 (Tex. App.–Tyler 1994, pet. ref'd); *see* TEX. R. EVID. 804(b)(2); *Williams v. State*, 800 S.W.2d 364, 368 (Tex. App.–Fort Worth 1990), *pet. ref'd*, 805 S.W.2d 474 (Tex. Crim. App. 1991).

Contemplation of death may be inferred from surrounding circumstances; it is not necessary that the declarant specifically express his awareness of impending death. *Scott*, 894 S.W.2d at 812 (citing *Thomas v. State*, 699 S.W.2d 845, 853 (Tex. Crim. App. 1985); *Hayes v. State*, 740 S.W.2d 887, 889 (Tex. App.–Dallas 1987, no pet.)). Circumstances to be considered in evaluating a potential dying declaration include (1) the express language of the declarant, (2) the nature of the injury, (3) any medical opinion provided to the declarant, and (4) the conduct of the declarant. *Scott*, 894 S.W.2d at 812. Additionally, the fact that the statement was made in response to a question does not render it inadmissible.[1] *Id.*

Further still, the length of time the declarant lives after making the declaration is immaterial. *See Charles v. State*, 955 S.W.2d 400, 404 (Tex. App.–San Antonio 1997, no pet.); *see also Herrera v. State*, 682 S.W.2d 313, 320 (Tex. Crim. App. 1984); *Franks v. State*, 625 S.W.2d 820, 822 (Tex. App.–Fort Worth 1981, pet. ref'd) (holding that fact declarant lived for eight weeks after making statement was immaterial to whether statement was dying declaration). The focus of the rule is on the declarant's state of mind when the statement is made, not on the eventual outcome of the patient's injuries. *Charles*, 955 S.W.2d at 404.

If hearsay was erroneously admitted, Appellant must show that the error was either of constitutional magnitude or affected a substantial right. *See* TEX. R. APP. P. 44.2(a), (b). Admission of a hearsay statement implicates both constitutional and non-constitutional error. *See Guidry v. State,* 9 S.W.3d 133, 149 (Tex. Crim. App. 1999) ("Admission of hearsay evidence against a criminal defendant implicates the Confrontation Clause of the Sixth Amendment because the defendant is not afforded the opportunity to confront the out-of-court declarant."); *see also Couchman v. State,* 3 S.W.3d 155, 160 (Tex. App.—Fort Worth 1999, pet. ref'd) (stating that court of criminal appeals treats violation of rules of evidence that results in erroneous admission of evidence as non-constitutional error). The harm analysis under Rule 44.2(a) imposes a more stringent standard than Rule 44.2(b). *Guidry,* 9 S.W.3d at 151 n.14.

Under Rule 44.2(a), if the appellate record in a criminal case reveals constitutional error subject to harmless-error review, we must reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a); *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex. Crim. App.

---

[1] This principle is not necessarily applicable where the declarant merely responds to leading questions. *Scott v. State*, 894 S.W.2d 810, 812 n.1 (Tex. App.–Tyler 1994, pet. ref'd).

2000); *Aguirre–Mata v. State,* 992 S.W.2d 495, 498 (Tex. Crim. App. 1999). In making a harmless-error determination under Rule 44.2(a), we do not focus on the weight of other evidence of guilt. Rather, we determine whether the error might have prejudiced a juror's decision-making process. *Montgomery v. State,* 821 S.W.2d 314, 317 (Tex. App.—Dallas 1991) (en banc), *pet. ref'd,* 827 S.W.2d 324 (Tex. Crim. App. 1992) (per curiam) (citing *Harris v. State,* 790 S.W.2d 568, 587 (Tex. Crim. App. 1989)).

In performing a harmless-error analysis under Rule 44.2(a), we isolate the effect of the error and determine how much weight a juror would probably place on the error. *Harris,* 790 S.W.2d at 587. If the error was of such a magnitude that in reasonable probability it disrupted the jury's orderly evaluation of all the evidence, no matter how overwhelming other evidence of guilt might have been, then the conviction must be reversed. *Id.* Unless the overwhelming evidence dissipates the error's effect on the jury's function in determining the facts, so that it did not contribute to the verdict, the error is harmful. *Id.* We ask if a reasonable probability exists that the evidence, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion beyond a reasonable doubt. *Wesbrook,* 29 S.W.3d at 119; *Cardenas v. State,* 971 S.W.2d 645, 651 (Tex. App.—Dallas 1998, pet. ref'd). If so, the error is harmful. *Wesbrook,* 29 S.W.3d at 119.

Whether the evidence is sufficient to convict without the inadmissible evidence is not the sole determinant in a Rule 44.2(a) harm analysis. *See Cardenas,* 971 S.W.2d at 651. Rather, we assess whether a reasonable probability exists that the erroneously admitted evidence contributed to the jury's verdict. *Id.* Thus, we must calculate as closely as possible the probable impact of the error on the jury in the context of the other evidence introduced at trial. *Harris,* 790 S.W.2d at 827. In making this determination, *Harris* directs us to examine six factors: (1) the source of the error; (2) the nature of the error; (3) whether and to what extent the State emphasized the error; (4) any collateral implications of the error; (5) the weight a juror would probably place on the error; and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.; Mosley v. State,* 960 S.W.2d 200, 204–05 (Tex. App.—Corpus Christi 1997, no pet.). We are "obligated to examine the entire record in a neutral, impartial and even-handed manner and not 'in the light most favorable to the prosecution.'" *Harris,* 790 S.W.2d at 587.

**Analysis**

Appellant argues in his brief that "the dying declarations statement should not have been permitted to be introduced." However, he fails to direct us to the challenged statement in the record. He states that "the statements that were made to the officers were admitted as dying declarations" without naming which officer's testimony he is referencing. However, he argues that the victim "was not incoherent when he was approached by officers" and that "the officer at the scene" did not testify to facts that would support the State's argument that the victim believed death was imminent when he made the statements. Based on this information and our review of the record, we construe Appellant's argument as a challenge to the testimony of Michael Molnes and Justin Killough.

Molnes testified that he was a detective with the Houston County Sheriff's Department in January 2016, and he was dispatched to assist on a call of a possible shooting. He further testified as follows:

Q. Was -- and did you recognize Frank Thomas? Did you know him at the time?
A. No.
Q. Was he conscious when you saw him laying there on the ground?
A. Yes, but in pain.
Q. Were you able to speak with him?
A. No, I wasn't but Lieutenant Killough did, and I overheard the conversation that was there.
Q. And what did you hear Frank Thomas [say] as he lay there on the ground?
MR. PEMBERTON: Judge, I'm going to object on the grounds that it's hearsay. It does not qualify as a dying declaration. There's been no showing that he believed his death was imminent, and it violates my right to confront the witness against him guaranteed by the Constitution of the United States, Sixth Amendment, and the Texas Constitution.
THE COURT: Sustained. You would have to --
MS. KASPAR: That's fine.
THE COURT: -- show an exception to hearsay.
MS. KASPAR: That's fine.
Q. (By Ms. Kaspar) Let's go back a little bit more to his condition. What did you see his condition to be?
A. He was laying on his back face up. There was blood spatter in the eyes, on the cheeks, face area. Both arms were covered in blood. The shirt was heavily drenched in blood. And the one gentleman had a compress on his chest, so I don't know what the extent of the damage to the chest area was at that time.
Q. At that time were you aware that he had a bullet in his back as well?
A. No.
Q. Did you later find that out?
A. Yes.
Q. Were you aware that he had a bullet in his brain at the time?
A. No.
Q. Did you find that out later?
A. Yes.
Q. How easy was it for Frank Thomas to speak to you while he was laying there?

A. He was in pain when he spoke, but he could – he could answer your questions. He was alert but you could tell he was in pain.

Q. In looking at the wounds, did you believe he may die?

A. Yes, I did.

Q. What made you think that?

A. The heavy loss of blood, the extent of the injury after I looked at it in the ambulance, and looks like it was traumatic blood loss, so I don't know how much more was in his body but I just know there was heavy blood loss.

Q. Then I would ask you again, what did he say?

MR. PEMBERTON: Judge, we will renew our objection. There was no showing that Mr. Thomas believed his death was imminent. It's hearsay and it violates the rights to confront the witnesses against my client.

THE COURT: Overruled.

Q. (Ms. Kaspar) You can answer. What did he say?

A. Lieutenant Killough asked him who shot him. He said: Len, Len shot me. Then he asked: Do you know his last name? He said: Yes, it's Intelisano.

Molnes's testimony was supported by that of Lieutenant Killough. Killough testified that he is a lieutenant with the Houston County Sheriff's Department. Killough also responded to the scene. He testified, in part, to the following:

A. I noticed superficial -- what I thought was superficial cuts at the time because of the bullet hole and the glass in that area. That's what I was thinking at the time.

Q. Was Mr. Thomas conscious when you first arrived?

A. Yes, he was.

Q. Were you able to talk to him?

A. Yes, I was.

Q. Based on what you saw, did you think Frank Thomas might die?

A. Yes, I did.

Q. What made you think that he might?

A. Well, simply because of the fact that I noticed the gunshot wound to his torso, and at the time just looking at his face, and I guess you put my years of experience or knowledge, and just speaking to him, the way he was talking and his facial expressions, I believed he was going to die.

Q. Did he appear to be in a great deal of pain?

A. Yes, he did.

Q. Okay. Did he appear that he had lost a lot of blood?

A. Yes, he did.

Q. Was he easy to understand when he talked?

A. Yes, at times and some not, because he was in shock -- I believed he was in shock and traumatized by the event.

Q. And what did he tell you?

MR. PEMBERTON: Judge, I'm going to object[] on grounds: number one, that it's hearsay; number 2 it doesn't qualify as a dying declaration because there's [no] showing that Mr. Thomas believed his death was imminent, and also that it violates my client's right to confrontation of witnesses against him under the Texas and Federal Constitution.

THE COURT: Overruled.

Q. (By Ms. Kaspar) What did he tell you?

A. He made the statement -- of course I was up there we was exchanging, and I asked him I said, "You know who shot you?" What did you -- and he was -- it was -- I noticed before I was up there he was already talking to some of the other people that was applying pressure, and -- and he said, "Len shot me."

8

Q. Did you know -- did you know who Len was?
A. No, I did not.
Q. Did you ask him who Len was?
A. Yes. I was -- as I constantly asked him, I said, "Well, who shot you? Who shot you?" He said, "Len," and at first I thought he said Len Delasano, and that's what I first heard it as, Delasano. And then as we continued our conversation, it was Intelisano.

While it appears that Appellant's challenge encompasses Killough's and Molnes's testimony, Michael Adcock, a Texas Ranger, testified that he interviewed the victim in the hospital. The audio recording of that interview was admitted, over Appellant's hearsay objection, into evidence. During that interview, which was confirmed during Ranger Adcock's testimony, Thomas identified Appellant as the man who shot him in a photo lineup. Appellant has not challenged the admission of the audio recording on appeal. Even if Killough's and Molnes's testimony was improperly admitted, the improper admission of evidence is not reversible when the same or similar evidence, such as the audio recording, is not challenged. *See Cox v. State*, No. 14-15-00684-CR, 2017 WL 716606, at \*4 (Tex. App.—Houston [14th Dist.] Feb. 23, 2017, pet. ref'd) (mem. op., not designated for publication).

Additionally, Appellant's theory at trial was that he acted in self-defense. The identity of the person who shot Thomas was not the issue at trial. Appellant made no attempt to claim that someone else shot Thomas and caused his death. Appellant testified that Thomas blocked the roadway with his vehicle and threatened him with a baseball bat. Appellant further testified that he did not "want to kill or cripple" Thomas, but he grabbed a shotgun from behind his seat and shot Thomas. Therefore, even if the admission of Thomas's statements to the officers was error, the statements were not pertinent to the primary issue at trial, and could not have contributed to the conviction or punishment, thereby making any error harmless. *See* TEX. R. APP. P. 44.2(a); *Carillo v. State*, No. 03-05-00844-CR, 2007 WL 541598, at \*6 (Tex. App.—Austin Feb. 23, 2007, no pet.) (mem. op., not designated for publication).[2] Under these circumstances, Appellant's second issue is overruled.

## DISPOSITION

Having overruled Appellant's first and second issues, we *affirm* the trial court's judgment.

---

[2] We also note that in his disproportionate sentence argument, Appellant concedes his guilt.

**GREG NEELEY**
Justice

Opinion delivered October 31, 2019.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)

10

# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

OCTOBER 31, 2019

NO. 12-18-00274-CR

**LEONARD INTELISANO,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 349th District Court
of Houston County, Texas (Tr.Ct.No. 16CR-049)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*