NUMBER 13-01-655-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG



ROBERT DE LA PAZ , Appellant,

 

v.




THE STATE OF TEXAS , Appellee.



On appeal from the 347th District Court

of Nueces County, Texas.



 MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Rodriguez and Castillo

Opinion by Justice Castillo




 A jury convicted appellant Robert De La Paz of murder and of engaging in organized criminal activity. After finding true
the enhancement of a previous felony conviction, the trial court assessed his punishment at two concurrent forty-year terms.
De La Paz contends that the trial court erred in overruling hearsay objections: (1) to the use of nonverbal gestures as a
dying declaration; and (2) to statements made to an accomplice who implicated De La Paz in the murder. We affirm. 

I. APPLICABLE APPELLATE RULES




 De La Paz filed a timely notice of appeal on September 19, 2001. The rules of appellate procedure governing how appeals
proceed in criminal cases were amended effective January 1, 2003. Generally, rules altering procedure do not fall within
the prohibition in the Texas Constitution against retroactive application of laws that disturb vested, substantive rights. See
Tex. Const. art. I, § 16; see also Ibarra v. State, 11 S.W.3d 189, 192 (Tex. Crim. App. 1999). Therefore, this Court applies
the current rules of appellate procedure to this appeal. We may not affirm or reverse a judgment or dismiss an appeal for
formal defects or irregularities in appellate procedure without allowing a reasonable time to correct or amend the defects or
irregularities. Tex. R. App. P. 44.3. We also are prohibited from affirming or reversing a judgment or dismissing an appeal
if the record prevents the proper presentation of an appeal and can be corrected by the trial court. Tex. R. App. P. 44.4(a). 
Accordingly, we abated the appeal on July 21, 2003 and ordered a supplemental record to include, in compliance with
rule 25.2(a)(2), the trial court's certification of De La Paz's right of appeal. See Tex. R. App. P. 25.2(a)(2). On July 31,
2003, the trial court filed a certification of De La Paz's right of appeal. We now turn to the merits. 

 This is a memorandum opinion not designated for publication. The parties are familiar with the facts. We will not recite
them here except as necessary to advise the parties of our decision and the basic reasons for it. See Tex. R. App. P. 47.4.

II. RELEVANT FACTS


 Testimony at De La Paz's trial focused on the activities of a highly structured group of individuals with bonds forged in the
Texas prison system. (1) Members of this cadre (2) of felons, testimony at trial showed, engaged in common pursuits and had
as their mutual interest and aim participation in every aspect of criminal behavior except sexual offenses. In February of
2000, the high-ranking membership of the Corpus Christi chapter of the cadre met to discuss executing one of its members,
Raul Peña. Peña had been stealing from the cadre and had insulted one of De La Paz's relatives. Fred Villarreal, leader of
the local chapter, ordered Peña's execution. Carlos Flores and Gabriel Martinez, both members of the cadre, were ordered
to carry out the execution. De La Paz and Raymond Gonzalez were selected to go "along . . . to gauge the reaction of the
people who actually carried out the execution . . . to see whether they were going to be able to withstand the pressure." De
La Paz was appointed as lookout. Testimony at trial connected members of the cadre to each other and specifically tied De
La Paz to the cadre, to the planning and commission of Peña's inept but ultimately successful execution, to the murder
weapon, and to Peña himself during the weeks and hours before the murder. Other than a description of Peña's gestures
during the final moments of his life, testimony at trial did not put the murder weapon in De La Paz's hand at the time of the
execution. 

 On March 6, 2000, Eddie Alvarado, then a member of the gang unit of the Corpus Christi Police Department ("CCPD"),
spoke with Gonzalez. Gonzalez claimed to be a member of the cadre. (3) Officer Alvarado recalled once seeing Gonzalez
and De La Paz together at a nightclub. On March 9, 2000, Girard Kinane, an investigator with the CCPD gang unit,
stopped a car matching the description of a vehicle involved in a shots-fired call under investigation. Gonzalez and Gabriel
Martinez were in the car. On March 18, 2000, Keith Starsheim, another member of the CCPD gang unit, stopped De La Paz
for a routine traffic violation. Peña was in the car with De La Paz. During the stop, Officer Starsheim asked De La Paz
about his involvement in the cadre. De La Paz claimed to be a high-ranking member. (4) On April 19, 2000, Officer
Alvarado had contact with both De La Paz and Peña on the block where Peña said he lived. Officer Alvarado testified he
knew both De La Paz and Peña to be members of the cadre. 

 Meanwhile, Gonzalez was living with Malena Gomez, whose mother had given her a green Ford Taurus. As a condition
of parole on a previous criminal conviction, Gonzalez was subject to an electronic monitoring system. Gonzalez's
electronic monitor recorded that he left the house he shared with Gomez at 9:08 on the morning of May 13, 2000. Gomez
awoke between 10:00 and 11:00 a.m. to find her car missing. 

 Debra Rodriguez, a friend of De La Paz, testified that sometime the morning of May 13, De La Paz left her house in her
Cadillac. Peña was with him. Rodriguez said De La Paz returned alone to Rodriguez's house, without Peña, thirty minutes
later. She testified De La Paz did not leave her house again until about 11:00 p.m. 

 About 2:00 the afternoon of May 13, a meeting of the cadre began at Rosendo Martinez's home. At 2:24 p.m., CCPD
Officer Dominic Bustamante pulled over a Cadillac on suspicion that a drug transaction had occurred. De La Paz and Peña
were in the Cadillac. The stop occurred outside Rosendo Martinez's house. After the stop, De La Paz and Peña went into
Rosendo Martinez's house. Rosendo Martinez testified that after the meeting, while those present began filing out of the
house, De La Paz and he remained inside. Rosendo Martinez shut the door and told De La Paz he could delay the
execution (scheduled for that day) if he wished. De La Paz replied he did not wish to do so. Rosendo Martinez then gave
De La Paz two weapons, a .32 semi-automatic pistol and a .380 semi-automatic pistol. 

 Testifying without objection to information he got from a conversation with Gabriel Martinez, Rosendo Martinez told the
jury that about 4:00 that afternoon, under the guise of collecting overdue drug debts, Flores, Gabriel Martinez, and
Gonzalez rode in Gomez's green Ford Taurus to a remote location. De La Paz, with Peña as passenger, followed in
Rodriguez's Cadillac. Both cars stopped. De La Paz let Peña out of the Cadillac "on the side of the road, right behind the
Taurus." 

 Following through on the planned execution, Gabriel Martinez tried to shoot Peña in the back. His gun jammed. Peña
fled through a field. Flores chased him. Gabriel Martinez fired three shots at Peña. His gun jammed again. Flores fired a
round that dropped Peña to the ground. He fired two more rounds at the man. Flores' gun jammed, too. He then hit Peña
with a tire iron. 

 Also about 4:00 that afternoon, Kenneth Bockholt was driving in the same isolated area. He noticed a green Ford Taurus
on the side of the road. He saw three men running into a field. He observed that the men were Hispanic and also that a
man sitting in the Taurus was Hispanic. Bockholt wrote down the license plate number, ZGL35C. Bockholt saw a person
in the field trying to "raise himself up off the ground." He noticed blood on the man's shirt. He watched until the other two
men got in the Taurus and drove off. Bockholt emphasized he saw only one vehicle at the scene.

 At 3:59 p.m., Officer Bustamante received a dispatch to respond to a reported stabbing. When Officer Bustamante got to
the scene with other officers, he saw Peña laying face down in the field. He recognized the man from his earlier traffic stop
of Peña and De La Paz. He observed that Peña's expression was a "blank stare" and remarked to another officer that it
appeared that Peña had been stabbed. Over De La Paz's objection, Officer Bustamante then testified about Peña's
nonverbal gestures. Peña motioned with his right hand "as if he was pulling a trigger of a gun." Officer Bustamante noticed
a bullet wound in Peña's lower back. He "asked the victim if the guy who he was with earlier had shot him." Peña nodded
in the affirmative. Officer Bustamante understood the gesture to mean that De La Paz had done the shooting. At 4:35 p.m.,
Kathleen Quesada, a CCPD crime scene technician, was dispatched to the scene. Quesada recovered two live rounds at the
scene. She observed a blood trail leading from near where she recovered the rounds to where Peña had been found. The
rounds were Winchester .380 automatic rounds. Quesada then "went [to the hospital] to photograph the victim and to
collect his clothing but . . . [she] was unable to photograph him so [she] collected the clothing that he had on at that time." 
As Quesada hung Peña's shorts to dry, a projectile fell out. It was later identified as a fired .25 round. 

 At 4:56 p.m., Gonzalez returned home, coming within range of his electronic monitoring device. CCPD Investigator Ray
Rivera took him in for police questioning. Between 5:30 and 6:15 that evening, Rosendo Martinez told the jury, he
discovered a black bag on his back porch. In the bag were bloody clothes, two pistols, and two pairs of shoes. Between
6:30 and 7:00 p.m., he testified without objection, he got a message from De La Paz that Peña had not died and that there
had been a witness to the execution. At 9:15 p.m., Quesada was dispatched to the CCPD Criminal Investigation Division
to photograph Gonzalez. Between 9:00 and 9:30 p.m., Rosendo Martinez had a conversation with De La Paz in Rosendo
Martinez's back yard. De La Paz told him, Rosendo Martinez testified without objection, that there had been a witness to
the murder. De La Paz said that Peña had not immediately died. He said that Peña had indicated to the authorities that he,
De La Paz, was responsible for the crime. 

 At 9:38 p.m., Officer Chrispin Mendez of the Nueces County Sheriff's Department responded to a call of a burning car in a
field. Officer Mendez observed that the fire "seemed to have been set intentionally." Officer Mendez identified the burned
license plate he found at the scene as reading ZGL35C, matching the plate number Bockholt had reported earlier. 

 Between 10:30 and 11:30 p.m., Rosendo Martinez testified, this time over De La Paz's objection, Gonzalez and he spoke
by phone. Gonzalez told him that a witness had seen Peña being chased and shot and had written down the plate number of
the green Ford Taurus. Gonzalez expressed to Rosendo Martinez a desire to leave town. Gonzalez returned home and left
again at 11:16 p.m., as noted by the electronic monitoring device. He fled to San Antonio, where he was arrested two
weeks later. Gomez testified Gonzalez had left because Gonzalez knew he had committed a parole violation. 

 At 11:30 p.m., Quesada was dispatched to the site of the burning vehicle. Quesada photographed the vehicle, the license
plate that lay on the ground, and a Ford decal. At trial, Gomez identified the burned-out vehicle as her Ford Taurus,
although she did not know the license plate number. 

 Peña died in the hospital. On May 15, 2000, Dr. Lloyd White, a pathologist, performed an autopsy on Peña. Dr. White
testified that the fatal wound "involved entry of the lower right back." There was "no evidence of it being a contact wound
or close range wound which indicates that it was probably fired from a distance of two or three feet or more." Other shots
hit Peña's right thigh, right forearm, and left wrist, where a bullet lodged in his hand. John Hornsby, a CCPD identification
supervisor, testified that he could not tell if the .380 bullet removed from Peña's hand was the same as the two .380 unfired
rounds recovered at the scene, only that it was similar. He further testified that if a handgun jams and the extractor is in
contact with the casing or hooked over the rim of the casing, it will eject an unfired round.

 About May 15, Investigator Rivera, the CCPD investigator assigned to investigate Peña's death, got a warrant issued for
De La Paz's arrest. After his arrest, De La Paz gave the following statement:

 My name is Robert De La Paz and I am 35 years of age, born July 25, 1964. I live at 2626 Aleman. Phone number
857-8299. On 5-15-2000, I was arrested by the Corpus Christi Police Department for murder. On 5-16-2000, Sargent Ray
Rivera picked me up at the Nueces County jail and brought me to the Corpus Christi Police Department. He read me my
rights for murder and I do understand my rights. On Saturday, May 13, 2000, at around 12 something, around lunch time, I
went by Debra Rodriguez' house at 1817 Kern Street. I was checking her car, Cadillac. Debra told me to give a guy, who I
know as Rock, a ride to Molina. When I left her house it was between 1:15 p.m. and 1:20 p.m. Rock told me to take him
to T.J. store. I thought it was on Elvira street. I saw a police officer on Villarreal and he followed me. He stopped me and
told me to pull over to Bloomington. He asked me for my drivers license and insurance. I gave it to him and before he left,
I told him I had a warrant out for me and he didn't say anything. He put both of us in the back seat of the police car and
searched the Cadillac. He took us out of the police car and put us back in the Cadillac and gave me back my drivers license
and told us we could go. I left and went to T.J.s and dropped Rock off at T.J.s and went back to Debra's. I got back to
Debra's at 1:45 p.m., maybe a little bit after that. I was back at her house before 2 p.m. I stayed there until 11 p.m.
Saturday. Debra was there and her brother Jay. On 5-16-2000, Sergeant Ray Rivera showed me a photo of the guy I know
as Rock. Sergeant Rivera told me his name is Raul Peña. This statement is true and correct to the best of my knowledge
and given to Sergeant Ralph Lee and Rivera. On October 24, 2000, Martin DeLeon, also a CCPD gang unit investigator,
went to Rodriguez's home in search of a murder suspect in an unrelated case. He saw De La Paz and two other men in the
front yard. He retrieved a handgun from a nearby tree. He identified the gun as a Raven .25 automatic pistol. Ballistics
matched the discharged .25 bullet that had fallen from Peña's shorts to the Raven .25. Rodriguez testified that De La Paz
was inside the house with her, not in the vicinity of the tree, when De Leon found the gun. A fingerprint on the handgun
belonged to one of the other two men, not to De La Paz. 

III. ANALYSIS


 Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in
evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). De La Paz contends that the trial court erred in
admitting hearsay evidence in the form of: (1) Peña's nonverbal gestures implicating De La Paz as the principal actor in the
shooting; and (2) statements implicating De La Paz as a participant in Peña's execution made to Rosendo Martinez by
Gabriel Martinez and Raymond Gonzalez. 

A. Waiver


 De La Paz objected on hearsay grounds to Officer Bustamante's testimony aboutPeña's nonverbal gestures. He also
objected as hearsay to Rosendo Martinez's testimony about what Raymond Gonzalez said about what happened the
afternoon of Peña's execution. He did not object to Rosendo Martinez's testimony that repeated what Gabriel Martinez said
about the details of Peña's execution. To preserve error for review on appeal, a defendant must object timely and
specifically and pursue the objection to a ruling at trial. Tex. R. App. P. 33.1 (a); Turner v. State, 805 S.W.2d 423, 431
(Tex. Crim. App. 1991). Further, the objecting party must object each time the objectionable evidence is offered. Fuentes
v. State, 991 S.W.2d 267, 273 (Tex. Crim. App. 1999). We hold that De La Paz waived any complaint as to Rosendo
Martinez's testimony about what Gabriel Martinez told him. 

B. Harm Analysis


 We assume, without deciding, that the trial court erred in admitting Peña's nonverbal gestures and Raymond Gonzalez's
statements to Rosendo Martinez. Even so, De La Paz is not entitled to reversal unless he shows that the error was: (1) of
constitutional magnitude; or (2) affected a substantial right. See Tex. R. App. P. 44.2(a), (b). Admission of a hearsay
statement implicates both constitutional and non-constitutional error. See Guidry v. State, 9 S.W.3d 133, 149 (Tex. Crim.
App. 1999) ("Admission of hearsay evidence against a criminal defendant implicates the Confrontation Clause of the Sixth
Amendment because the defendant is not afforded the opportunity to confront the out-of-court declarant."); see also
Couchman v. State, 3 S.W.3d 155, 160 (Tex. App.-Fort Worth 1999, pet. ref'd) (stating that court of criminal appeals treats
violation of rules of evidence that results in erroneous admission of evidence as non-constitutional error). We begin our
harm analysis under rule 44.2(a), which imposes a more stringent standard than rule 44.2(b). Guidry, 9 S.W.3d at 151 n.14. 


 Under rule 44.2(a), if the appellate record in a criminal case reveals constitutional error subject to harmless-error review,
we must reverse a judgment of conviction or punishment unless we determine beyond a reasonable doubt the error did not
contribute to the conviction or punishment. Tex. R. App. P. 44.2(a); Wesbrook v. State, 29 S.W.3d 103, 119 (Tex. Crim.
App. 2000); Aguirre-Mata v. State, 992 S.W.2d 495, 498 (Tex. Crim. App. 1999). In making a harmless-error
determination under rule 44.2(a), we do not focus on the weight of other evidence of guilt. Rather, we determine whether
the error might have prejudiced a juror's decision-making process. Montgomery v. State, 821 S.W.2d 314, 317 (Tex.
App.-Dallas 1991) (en banc), pet. ref'd, 827 S.W.2d 324 (Tex. Crim. App. 1992) (per curiam) (citing Harris v. State, 790
S.W.2d 568, 587 (Tex. Crim. App. 1989)). 

 In performing a harmless-error analysis under rule 44.2(a), we isolate the effect of the error and determine how much
weight a juror would probably place on the error. Harris, 790 S.W.2d at 587. If the error was of such a magnitude that in
reasonable probability it disrupted the jury's orderly evaluation of all the evidence, no matter how overwhelming other
evidence of guilt might have been, then the conviction must be reversed. Id. Unless the overwhelming evidence dissipates
the error's effect on the jury's function in determining the facts, so that it did not contribute to the verdict, the error is
harmful. Id. We ask if a reasonable probability exists that the evidence, either alone or in context, moved the jury from a
state of nonpersuasion to one of persuasion beyond a reasonable doubt. Wesbrook, 29 S.W.3d at 119; Cardenas v. State,
971 S.W.2d 645, 651 (Tex. App.-Dallas 1998, pet. ref'd). If so, the error is harmful. Wesbrook, 29 S.W.3d at 119. 

 Whether the evidence is sufficient to convict without the inadmissible evidence is not the sole determinant in a rule 44.2(a)
harm analysis. See Cardenas, 971 S.W.2d at 651. Rather, we assess whether a reasonable probability exists that the
erroneously admitted evidence contributed to the jury's verdict. Id. Thus, we must calculate as closely as possible the
probable impact of the error on the jury in the context of the other evidence introduced at trial. Harris, 790 S.W.2d at 827. 
In making this determination, Harris directs us to examine six factors: (1) the source of the error; (2) the nature of the
error; (3) whether and to what extent the State emphasized the error; (4) any collateral implications of the error; (5) the
weight a juror would probably place on the error; and (6) whether declaring the error harmless would encourage the State to
repeat it with impunity. Id.; Mosley v. State, 960 S.W.2d 200, 204-05 (Tex. App.-Corpus Christi 1997, no pet.). We are
"obligated to examine the entire record in a neutral, impartial and even-handed manner and not 'in the light most favorable
to the prosecution.'" Harris, 790 S.W.2d at 587.

 Here, the source and nature of the error, if any, was the trial court's admission of evidence of Peña's nonverbal gestures and
Gonzalez's statements to Rosendo Martinez regarding the commission of Peña's execution. Peña's nonverbal
gesturesimplicated De La Paz as the actual shooter. Raymond Gonzalez's statements to Rosendo Martinez implicated De
La Paz as a principal participant in Peña's execution. The State did emphasize Peña's gestures and Rosendo Martinez's
testimony as a whole. However, while other evidence of guilt is not a sole determinant, any collateral implications of
admitting the evidence and the amount of weight the jury placed on the evidence were minimal because the jury heard
other, substantial evidence related to De La Paz's participation in the planning and commission of Peña's execution. 
Finally,Peña's gestures and Raymond Gonzalez's statements to Rosendo Martinez contradicted each other with regard to
whether De La Paz was a principal shooter or a party to the murder. Peña's gestures, in fact, contradicted all of the State's
other evidence, which implicated De La Paz as a party but not as one of the shooters. Thus, because of the unusual
circumstances presented by this case, we cannot say that it is likely that the State will repeat this type of error, if any, with
impunity. See id. 

 The most significant concern in a rule 44.2(a) harm analysis is the effect of any erroneously admitted evidence on the
integrity of the trial process. Id. While not determinative of the harm question, the presence of overwhelming evidence
supporting a jury's finding of guilt is a factor in the evaluation of harmless error under rule 44.2(a). Id. Here, De La Paz
did not object to Rosendo Martinez's testimony regarding his direct conversations with De La Paz about planning and
committing the execution. (5) Also, Rosendo Martinez's testimony about Gabriel Martinez's description of how the
execution occurred came into evidence without objection. De La Paz also does not challenge on appeal the admissibility of
DeLeon and Rodriguez's testimony linking him to the murder weapon. (6) 

 In addition to his presence (only feet away, according to DeLeon) in the vicinity of a weapon that ballistics matched as the
handgun that fired the projectile found in Peña's shorts, De La Paz was observed in Peña's company several times in the
weeks leading up to the execution, up to an hour-and-a-half before Peña was murdered. De La Paz's own statement
corroborates that he was with Peña in the hours leading up to the murder. Further, De La Paz admitted to a police officer
that he was a ranking member of the cadre. He associated with other persons implicated in Peña's execution who also had
ties to the cadre. Finally, Rosendo Martinez testified, without objection, that De La Paz told him after the murder that Peña
had lived long enough to point to De La Paz as the shooter. The jury could have inferred from the timing of events that
Gonzalez learned this information during police questioning, when he was detained after the shooting, and then told De La
Paz (in addition to telling Rosendo Martinez), who in turn also related the information to Rosendo Martinez. At a
minimum, the evidence supports an inference that close communication between cadre members implicated in Peña's
execution occurred immediately after the murder. 

 The State indicted De La Paz both for murder (7) and for engaging in organized criminal activity, with the same murder as
the object of the criminal enterprise. (8) Both counts alleged De La Paz "caus[ed] the death of an individual, Raul Peña, by
shooting Raul Peña with a firearm." With sufficient evidence of De La Paz's participation in the planning and commission
of Peña's execution, the indictment supported a jury instruction on the law of parties even without a parties allegation in the
indictment. See Goff v. State, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996). Evidence not challenged by De La Paz
implicated him in the planning and commission of Peña's murder and supported the trial court's instruction to the jury under
the law of parties. (9) The same unchallenged evidence supports De La Paz's conviction under the law of parties for Peña's
murder as well as for engaging in organized criminal activity with Peña's execution as its object. See McIntosh v. State, 52
S.W.3d 196, 200 (Tex. Crim. App. 2001); see also Tex. Pen. Code Ann. § 71.02 (Vernon 2003). 

 We have examined the entire record. We conclude, beyond a reasonable doubt, that any error in admitting hearsay
testimony describing Peña's nonverbal gestures and detailing statements Raymond Gonzalez made to Rosendo Martinez did
not contribute to De La Paz's conviction. Other evidence dissipated the effect of the evidence on the jury's determination of
the facts. The integrity of the process leading to De La Paz's conviction was not affected by admission of the hearsay
evidence. We cannot say that admission of hearsay evidence over De La Paz's objection "moved the jury from a state of
nonpersuasion to one of persuasion beyond a reasonable doubt." See Wesbrook, 29 S.W.3d at 119; see also Cardenas,
971 S.W.2d at 651. 

 As to De La Paz's punishment, we conclude, beyond a reasonable doubt, that any error in admitting hearsay testimony
describing Peña's nonverbal gestures and detailing statements Raymond Gonzalez made to Rosendo Martinez did not
contribute to the trial court's imposition of De La Paz's concurrent forty-year sentences. The trial court, not the jury,
assessed punishment. The trial court did not impose the maximum sentence. These factors mitigate against a finding of
harm. See Roberts v. State, 866 S.W.2d 773, 776 (Tex. App.-Houston [1st Dist.] 1993, pet. ref'd). 

 We hold that any error admitting hearsay testimony describing Peña's nonverbal gestures and statements Raymond
Gonzalez made to Rosendo Martinez was harmless. Having concluded that the error, if any, was harmless under rule
44.2(a), we need not conduct a separate harm analysis under the less stringent standard imposed by rule 44.2(b) in
analyzing the harm of a non-constitutional error. See Guidry, 9 S.W.3d at 151 n.14; compare Tex. R. App. P. 44.2(a) with
Tex. R. App. P. 44.2(b). We overrule both of De La Paz's issues.

IV. CONCLUSION


 Accordingly, we affirm the judgment of the trial court. 

 

ERRLINDA CASTILLO

Justice



Do not publish .

Tex. R. App. P. 47.2(b).



Opinion delivered and filed

this 1st day of August, 2003. 



1. We find the organization discussed in published and unpublished cases in Texas dating from 1990. See, e.g., Esparza v.
Diaz, 802 S.W.2d 772, 778 (Tex. App.-Houston [14th Dist.] 1990, no writ).

2. "Cadre" is defined as "[a] nucleus or core group especially of trained personnel or active members of an organization
who are capable of assuming leadership or of training and indoctrinating others." Webster's Third New Int'l Dictionary 312
(1993). 

3. One of the identifying characteristics of membership in the cadre appears to be a willingness to volunteer information
regarding one's involvement, thus invoking the claimed power of the cadre merely by uttering its name. 

4. See note 3. 

5. Rosendo Martinez's accomplice testimony must be "corroborated by other evidence tending to connect the defendant
with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 1979). The required corroborative evidence may be either circumstantial or
direct and need not directly link the accused to the crime. Richardson v. State, 879 S.W.2d 874, 880 (Tex. Crim. App.
1993); Reed v. State, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988). Further, the corroborating evidence need not establish
guilt beyond a reasonable doubt. Id. Finally, "proof that the accused was at or near the scene of the crime at or about the
time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so
as to furnish sufficient corroboration to support a conviction." Brown v. State, 672 S.W.2d 487, 489 (Tex. Crim. App.
1984). De La Paz does not challenge the corroboration for Rosendo Martinez's testimony, and we note that the record
shows ample corroboration. 

6. See Robinette v. State, 816 S.W.2d 817, 818 (Tex. App.-Eastland 1991, no writ) (considering testimony identifying
murder weapon as pistol that witness had delivered to defendant shortly before shooting, along with other evidence, in
holding evidence sufficient to support murder conviction). 

7. Tex. Pen. Code Ann. § 19.02 (Vernon 2003).

8. Tex. Pen. Code Ann. § 71.02 (Vernon 2003).

9. De La Paz does not assert charge error.